UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

VFS FINANCING, INC., and GE
EQUIPMENT CORPORATE AIRCRAFT
TRUST 2012-1 LLC,

                              **Plaintiffs,**

       **v.**

FALCON FIFTY LLC, SKY KING LLC,
PHILIP L. ROGERS, and ALISA K.
ROGERS,

                              **Defendants,**

       **v.**

GENERAL ELECTRIC CAPITAL
CORPORATION, and CANAL AIR LLC,

                    **Third-Party Defendants.**

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/30/14

<u>OPINION AND ORDER</u>

13 Civ. 3534 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

      VFS Financing, Inc. ("VFS") and GE Equipment Corporate Aircraft

Trust 2012-1 LLC ("GEECAT") bring this diversity action against Falcon Fifty

LLC ("Falcon Fifty"), Sky King LLC ("Sky King"), and Philip and Alisa Rogers

seeking damages for the alleged breach of two financing agreements that facilitated

1

defendants' purchase of two airplanes in 2009 and 2010.  Defendants bring the

following counterclaims:  1) breach of contract against VFS; 2) breach of the

implied covenant of good faith and fair dealing against GEECAT; and 3) violation

of the New York Retail Installment Sales Act, N.Y. Pers. Prop. §§ 401, *et seq*.

("NYRISA") against both VFS and GEECAT.  Defendants also bring the

following claims in a third-party complaint: 1) tortious interference with contract

against General Electric Capital Corporation ("GE Capital"); 2) breach of contract

against GE Capital; and 3) violation of NYRISA against both GE Capital and

Canal Air LLC ("Canal").

Plaintiffs and third-party defendants now move to dismiss defendants'

counterclaims and third-party claims under Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim upon which relief can be granted.  For the

following reasons, the motion is GRANTED in part and DENIED in part.

## II.  BACKGROUND[1]

### A.  The Falcon Loan

Phil Rogers was the President and CEO of Catch the Wind, Inc.

("CTW"), a company that develops, manufactures and sells laser-based wind

---

[1]      Unless otherwise indicated, the facts are drawn from the Second
Amended Answer, Counterclaims, and Third-Party Complaint.  The three sections
are separately numbered, so I refer to each separately as necessary.

sensing equipment.[2]  Phil Rogers and his wife Alisa also sat on CTW's board of directors.[3]  At some point in 2009, CTW "became interested in owning a corporate aircraft, a Dassault Falcon 50" (the "Falcon Aircraft"),[4] and established Falcon Fifty LLC, a Delaware limited liability company whose members were CTW (75% ownership interest) and Tristar Aviation LLC ("Tristar") (25% ownership interest). Falcon Fifty was formed as a single purpose entity for the purpose of owning the aircraft.  Phil and Alisa Rogers, through another LLC, are the members of Tristar. "The Rogers' ownership of Falcon Fifty, through Tristar, was intended to allow the Rogers' personal use of the Falcon Aircraft."[5]

Falcon Fifty purchased the Falcon Aircraft from GEECAT through a financing agreement with VFS (the "Falcon Loan").  GEECAT is a limited liability company whose sole member is GE Capital and VFS is a wholly owned-subsidiary of GE Capital.  VFS and GE Capital are both Delaware corporations.

---

[2]    Counterclaims ¶¶ 2, 32.  Catch the Wind, Inc. ("CTW") was the operating company for Catch the Wind, Ltd. *See id.* ¶ 1.  For ease of reference, I will refer to both as "CTW."

[3]    *See id* ¶ 2.

[4]    *Id.* ¶ 1.

[5]    *Id.* ¶ 3.

The contract governing the Falcon Loan (the "Falcon Security Agreement"), provides that "[Falcon Fifty] shall be in default under this Agreement . . . upon the occurrence of . . . any merger or consolidation involving [Falcon Fifty] . . . or any change in control . . . with respect to [Falcon Fifty]."[6] The Falcon Security Agreement further provides that "THIS AGREEMENT AND THE DEBT DOCUMENTS SHALL NOT BE CHANGED OR TERMINATED, NOR SHALL ANY WAIVER BE GIVEN, ORALLY OR BY COURSE OF CONDUCT, BUT ONLY IN A WRITING SIGNED BY BOTH PARTIES HERETO" and that "[n]o waiver by [VFS] of any default shall operate as a waiver of any other default or of the same default on a future occasion."[7]  Phil and Alisa Rogers personally guaranteed the Falcon Loan.

## B.   The Sky King Loan

In 2010, Phil and Alisa Rogers, "through [Sky King], another single purpose entity," purchased a Raytheon Beech Premier 1A (the "Premier Aircraft") from Canal.[8]  Canal is a wholly-owned subsidiary of GE Capital and affiliate of

---

[6]     9/21/09 Falcon Security Agreement, Exhibit ("Ex.") B to Declaration of Christopher Lynch, counsel for plaintiffs and third-party defendants, ("Lynch Decl.") ("Falcon Security Agreement") § 8(o).

[7]     *Id.* §§ 10, 13(g)

[8]     Counterclaims ¶ 6.

4

GEECAT.[9]  VFS provided the financing for this purchase (the "Sky King Loan").

The terms of the Sky King Loan are substantially similar to the Falcon Loan and

also include a personal guarantee from the Rogers.

> The Sky King Security Agreement provides
>
>> [Sky King] shall be in default under this Agreement and each of
>> the other Debt Documents upon the occurrence . . . of any default
>> under any other agreement beyond any applicable grace or cure
>> periods set forth therein . . . between [Sky King], and Guarantor
>> and/or parent entities, subsidiaries, or affiliates (on the one hand)
>> and [VFS] (or any of its affiliates, subsidiaries or parent entities
>> (on the other hand).[10]

The Sky King Security Agreement also includes waiver provisions identical to the

Falcon Security Agreement.  Both agreements include a choice of law provision

stating that the agreements are governed by New York law and that any dispute

should be adjudicated in either federal or state courts in New York.  On June 27,

2012, VFS assigned all of its rights, title, and interests in and to the Sky King Loan

to GEECAT, but remained the subservicer of the loan.

### C.    Change in Falcon Fifty Ownership

In June 2010, CTW re-domiciled to a foreign country.  Because the

Federal Aviation Act requires that any entity owning a plane in the United States

---

[9]    *See id.*

[10]    6/25/10 Sky King Security Agreement, Ex. D to Lynch Decl., § 8(k).

be a domestic entity, Falcon Fifty had to change its ownership structure so that it became 75% owned by Tristar and 25% owned by CTW.  VFS did not oppose this change in ownership, cease to perform under the contract, or stop accepting Falcon Fifty's payments.

In October 2011, CTW withdrew its remaining interest in Falcon Fifty due to a dispute with Phil and Alisa Rogers.  This left Tristar, which "had never contemplated paying the full loan amount," as the sole member.[11]  At around this time, "the Rogers contacted VFS to inquire about restructuring the Falcon Loan . . . [and] were directed to Beth Bonnell, GE Capital's VP of Global Restructuring."[12]  Although Bonnell initially expressed interest in working to restructure the loan, no such deal occurred.  Bonnell asked the Rogers to provide additional collateral in the form of shares of Optocal Air Data Systems, the Rogers' wholly-owned company.  The Rogers refused, citing stock restrictions.   Falcon Fifty continued to make, and VFS continued to accept, timely payments on the loan.

### D.    VFS's Refusal to Consent to a Lease Agreement

After CTW's withdrawal, Falcon Fifty had no authority to operate the aircraft because the Falcon Security Agreement requires that "the use of the

---

[11]     Counterclaims ¶ 20.

[12]     *Id.*

6

[Falcon Aircraft] shall be predominately for business purposes."[13]  While CTW had a business purpose for operating the Aircraft, Tristar's "sole purpose for existing was to own membership shares in Falcon Fifty.  [It] conducted no business."[14]  But the Security Agreement allowed Falcon Fifty to "lease or charter" the Falcon Aircraft upon receiving VFS's "prior written consent."[15]  The same provision stated that "such consent [was] not to be unreasonably withheld."[16]

In October 2010, shortly after the first change in ownership, VFS consented to Falcon Fifty leasing the aircraft to Short Hill Aviation Services.  That lease terminated on January 27, 2012.  Falcon Fifty sought a replacement lessee and negotiated a two year lease with Stellar Corporation ("Stellar").  "[Alisa] Rogers made it clear to Bonell . . . that it was essential for Falcon Fifty to lease the Falcon Aircraft in order to remain current on the Falcon Loan and that the opportunity for a two year lease with a qualified lessee was a rare and outstanding opportunity."[17]  Rogers also told Bonnell "that the lessee was willing to pay all the

---

[13]     Falcon Security Agreement § 5a.

[14]     *Id.*

[15]     *Id.* Section 5a also required Falcon Fifty to make the necessary regulatory filings and registrations to facilitate the operation of the plane by third parties.

[16]     *Id.*

[17]     Counterclaims ¶ 36.

costs associated with the ownership and operation of the Falcon Aircraft."[18]

Through Bonnell, VFS refused to consent to the lease.  Instead, it proposed a one

year lease with different terms, which Stellar agreed to.  After the conclusion of the

first year, Stellar decided not to renew the lease.  Shortly thereafter, VFS declared

the Falcon Loan in default, which triggered the Sky King Security Agreement's

cross-default provision and put the Sky King Loan in default as well.

## III.   LEGAL STANDARD ON A MOTION TO DISMISS

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court

must "'accept[] all factual allegations in the [pleading] as true, and draw[] all

reasonable inferences in the [counterclaim plaintiff's] favor.'"[19]  The court may

consider "only the [pleading], . . . any documents attached thereto or incorporated

by reference and documents upon which the [pleading] relies heavily."[20]

Allegations in the pleading that are "contradicted by more specific allegations or

documentary evidence" are not entitled to a presumption of truthfulness.[21]

---

[18]    *Id.*

[19]    *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011)
(quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).

[20]    *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d
184, 187 (2d Cir. 2012) (quotation marks omitted).

[21]    *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 175 n.1 (2d Cir. 2013)
(citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

The court evaluates the sufficiency of the pleading under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[22] Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[23] For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[24] Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[25] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[26] "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."[27]

---

[22]  *See* 556 U.S. 662, 678–79 (2009).

[23]  *Id.* at 679.

[24]  *Id.* at 678.

[25]  *Id.* at 679.

[26]  *Id.* at 678.

[27]  *Id.* (quotation marks omitted).

## IV.   APPLICABLE LAW

### A.   Breach of Contract

The elements of breach of contract under New York law are well established: "(1) the existence of a contract between [the plaintiff] and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach."[28]

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."[29]   A breach is material if it "go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract."[30]

"Conversely, a breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has

---

[28]   *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

[29]   *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).

[30]   *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (quotation marks omitted).

substantially performed [its] end of the contract."[31]  "The issue of whether a party

has substantially performed is usually a question of fact and should be decided as a

matter of law only where the inferences are certain."[32]  The New York Court of

Appeals has instructed courts to consider factors like the magnitude of default, its

effect on the contract's purpose, the willfulness of the breach, and the degree to

which the injured party has benefitted under the contract.[33]

        Even where the breach is material, New York's doctrine of election of

remedies provides that

> the non-breaching party must choose between two remedies – it
> can elect to terminate the contract and recover liquidated damages
> or it can continue the contract and recover damages solely for the
> breach. A party can indicate that it has chosen to continue the
> contract by continuing to perform under the contract or by
> accepting the performance of the breaching party. Once a party
> elects to continue the contract, it can never thereafter elect to
> terminate the contract based on that breach, although it retains the

---

    [31]    *Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 287 (E.D.N.Y.
2013).

    [32]    *Merrill Lynch*, 500 F.3d at 186.

    [33]    *See Hadden v. Consolidated Edison Co. of N.Y.*, 34 N.Y.2d 88, 96
(1974). *Accord* Restatement (Second) of Contracts § 241 (1981) (listing
circumstances that are significant for determining materiality of a breach, including
"the extent to which the injured party will be deprived of the benefit which he
reasonably expected" and "the extent to which the behavior of the party failing to
perform or to offer to perform comports with standards of good faith and fair
dealing").

option of terminating the contract based on other, subsequent breaches.[34]

## B.   Covenant of Good Faith and Fair Dealing

Under New York law, every contract contains an implied promise that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[35]   A breach of the covenant is "merely a breach of the underlying contract," and "cannot be used to create new contractual rights between the parties."[36]

## C.   New York Retail Installment Sales Act

NYRISA governs retail installment contracts, obligations and credit agreements, which are, in sum and substance, "agreement[s] entered into in this state" pursuant to which a retail buyer pays in installments either 1) the time of sale price for goods purchased from a retail seller, or 2) his outstanding indebtedness for goods purchased from a retail seller.[37]   NYRISA defines retail buyer and retail

---

[34]     *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (citation and alterations omitted).

[35]     *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990).

[36]     *Cohen v. Elephant Wireless, Inc.,* No. 03 Civ. 4058, 2004 WL 1872421, at *11 (S.D.N.Y. Aug. 19, 2004) (quotation marks and citations omitted).

[37]     NY Pers. Prop. L. §§ 401(6-8).   The statute also permits retail sellers to retain a security interest in the goods

seller circularly: a retail seller is "a person who sells goods . . . to a retail buyer" and a retail buyer is a "a person who buys goods . . . from a retail seller." "Goods" are defined as "all chattels personal . . . sold for other than a commercial or business use or for purpose of resale."[38]

### D.   Piercing the Corporate Veil

"New York's choice of law rules provide that 'the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.'"[39]  Delaware law applies here because GE Capital and VFS are both incorporated in Delaware.  Under Delaware law, "a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner."[40]  "To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show [1] a mingling of the operations of the entity and its owner [,and] [2] an 'overall element of injustice or unfairness.'"[41]

---

[38]     *Id.* § 401(1).

[39]     *Taizhou Zhongneng Import and Export Co., Ltd. v. Koutsobinas*, 509 Fed. App'x 54, 56 n.2 (2d Cir. 2013) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

[40]     *Geyer v. Ingersoll Publ'n Co.*, 621 A.2d 784, 793 (Del. Ch. 1992).

[41]     *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168,176-77 (2d Cir. 2008) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ. A.

Several factors are relevant to determining the first prong of the

Delaware test, including

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.[42]

"The separate corporate existences of parent and subsidiary will not be set aside

merely on a showing of common management of the two entities, nor on a showing

that the parent owned all the stock of the subsidiary."[43]

The second element of the Delaware test requires demonstrating a

"fraud or similar injustice" in the "use of the corporate form.  [T]he underlying

cause of action[, at least by itself,] does not supply the necessary fraud or injustice.

To hold otherwise would render the fraud or injustice element meaningless, and

would sanction bootstrapping."[44]

---

1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)).

[42]     *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988).

[43]     *Capmark Fin. Group Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 350 (S.D.N.Y. 2013) (applying Delaware law) (quotation omitted).

[44]     *Brown v. GE Capital Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (quotations and other marks omitted).

14

### E.   Tortious Interference with Contract

The elements of tortious interference with contract under Virginia

law[45] are:

> (i) the existence of a valid contractual relationship or business
> expectancy; (ii) knowledge of the relationship or expectancy on
> the part of the interferor; (iii) intentional interference inducing or
> causing a breach or termination of the relationship or expectancy;
> and (iv) resultant damage to the party whose relationship or
> expectancy has been disrupted.[46]

Where the allegation is based on interference with a business or contract

expectancy, as opposed to a legally binding contract, Virginia requires proof that

the interferor used "improper means" to interfere with the relationship or

expectancy.[47]

## V.   DISCUSSION

### A.   Breach of Contract Claim Against VFS and Breach of Implied
### Covenant of Good Faith and Fair Dealing Against GEECAT

---

[45]   Defendants plead, and plaintiffs appear to accept, that Virginia law should govern this claim because the alleged tortious interference caused damages to the Rogers in Virginia, the state where they reside.

[46]   *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 145 (2009).

[47]   *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 414–15 (1997).

Defendants argue that VFS breached the Falcon Security Agreement by unreasonably withholding its consent to the two-year Stellar lease, despite the fact that the lease contained substantially similar terms and conditions to previously approved leases and with full knowledge of the fact that leasing the aircraft was the only way Falcon Fifty could continue to make timely payments on the loan.[48] Defendants argue that this breach caused them to default on the Falcon Loan, which triggered the cross-default provision of the Sky King Loan.[49] Defendants further contend that VFS acted as the subagent for GEECAT for purposes of the Sky King Loan because VFS continued to be the subservicer on that loan.[50] Thus, defendants argue that GEECAT breached the covenant of good faith and fair dealing, by virtue of its subagent's actions which triggered the default of the Sky King Loan.[51]

VFS responds that the counterclaims fail as a matter of law because its performance under both loans was excused by virtue of Falcon Fifty's "prior

---

[48]   *See* Counterclaims ¶¶ 49-56.

[49]   *See id.*

[50]   *See id.* ¶ 68.

[51]   *See id.* ¶¶ 69-71.

material breach."[52]  VFS contends that under Section 8(o) of the Falcon Security

Agreement, Falcon Fifty was in default both when CTW lowered its membership

interest from 75% to 25% and again when CTW withdrew its interest entirely.[53]

According to plaintiffs, this earlier material breach excused VFS from performing

under the Falcon Loan, and independently triggered the cross-default provision of

the Sky King Loan.

      In order to accept VFS's theory, I would be required to find – as a

matter of law – that defendants' earlier breaches were material.  But the materiality

of a breach is highly fact specific and defendants have alleged enough facts to

plausibly suggest that the earlier breaches were not material.  VFS did not oppose

either change in ownership or seek to terminate the agreement as a result.  Falcon

Fifty continued to make payments on the loan and VFS continued to accept them.

VFS continued to perform under the agreement, including consenting to the Short

Hills and one-year Stellar leases.  Further, CTW posted neither collateral nor

security for the loan, which could lead to a reasonable inference that its exit from

Falcon Fifty was not material.

---

[52]    Plaintiffs and Third-Party Defendants' Memorandum of Law in
Support of Motion to Dismiss Defendants' Counterclaims and Third-Party Claims,
at 6.

[53]    *See id.* at 7.

Even if the breaches were material, defendants have sufficiently pled an election of remedies defense.  Although VFS argues that the Security Agreements' waiver provisions forbid any waiver of default other than in writing by both parties, the election of remedies doctrine under New York law states that if a non-breaching party chooses to continue performance after a breach, it cannot then seek to terminate that contract based on the same breach.  The only remedy is damages arising from the earlier breach.  Because Falcon Fifty continued to make payments on the loan and VFS continued to accept those payments, it is reasonable to infer that VFS elected to continue performing under the contract and its failure to perform cannot be excused.

Defendants state a claim for both breach of contract against VFS and breach of the covenant of good faith and fair dealing against GEECAT.  Taking defendants' allegations as true, VFS's refusal to consent to the two-year Stellar lease was unreasonable where the terms of the lease were substantially similar to prior leases that VFS had approved, where the lessee agreed to pay for all costs associated with ownership and operation of the Falcon Aircraft, where Falcon Fifty, through Alisa Rogers, told VFS that the lease was necessary to allow Falcon Fifty to remain current on the loan, and where VFS knew that a default on the Falcon Loan would trigger a default on the Sky King Loan.  Defendants have

18

plausibly alleged that VFS was acting on its own behalf for the purpose of the Falcon Loan and as an agent for GEECAT for the purpose of the Sky King Loan. Plaintiffs' motion to dismiss the breach of contract and breach of the implied covenant of good faith and fair dealing claims is DENIED.

## B.   Claims Against GE Capital

### 1.   Breach of Contract

Defendants claim, in a third-party complaint, that GE Capital breached the Falcon and Sky King Loans by causing VFS to unreasonably withhold consent to the two-year Stellar lease.[54]  GE Capital is not a party to the Falcon and Sky King Loans.  Defendants allege that GE Capital is an "alter ego" of VFS and GEECAT and "exerts complete control over" both.[55]  Thus, according to defendants, "any breach by VFS [or GEECAT] [is] therefore [a] breach[] by GE Capital."[56]

Defendants have not sufficiently pled an alter ego theory.  The counterclaims and third-party complaint contain, at best, conclusory statements that GE Capital "controls" VFS and GEECAT or acts as VFS's "manager."  But

---

[54]   *See* Third-Party Complaint, ¶¶ 36-47

[55]   *Id.* ¶¶ 37-38, 43-44.

[56]   *Id.* ¶¶ 39, 45.

the only specific allegation to support that claim is that defendants were told by VFS to communicate with Bonnell, GE Capital's VP of Global Restructuring, about the loans.  However, the mere fact that a "subsidiary shares employees, officers, and directors with a parent does not permit the corporate form to be disregarded."[57]  A court cannot "infer domination and control" when "[t]he only factual allegation tying together the . . . entities is that the same employees managed" the transactions at issue.[58]  Further, defendants make no allegations showing that there was any fraud or similar injustice inherent in the use of the corporate forms, separate from the alleged unfairness or injustice arising from this transaction.  This is not enough to pierce the corporate veil.

Defendants' third-party claims for breach of contract against GE Capital are dismissed without leave to amend.  Defendants state that "[w]ith the exception of GE Capital's dominance over VFS and GEECAT, [d]efendants will not know which other factors [under the Delaware test for piercing the corporate veil] . . . are applicable to GE Capital until . . . discovery."[59]  But defendants have

---

[57]     *Capmark*, 491 B.R. at 350.

[58]     *Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, No. 09 Civ. 14014, 2010 WL 3522132, at *10 (Bankr. D. Del. Sept. 1, 2010).

[59]     Defendants' Opposition to Motion to Dismiss Counterclaims and Third-Party Claims, at 14.

alleged no facts to even suggest GE Capital's "dominance." By defendants' own admission, amendment would be futile.

### 2.   Tortious Interference with Contract

#### a.   Falcon and Sky King Loans

However, defendants have adequately pled that GE Capital, through Bonnell, tortiously interfered with the Falcon and Sky King Loans. The loan agreements were valid contracts. GE Capital knew of the existence of the contracts. Bonnell's actions on behalf of GE Capital may have been sufficient to constitute "intentional interference" that resulted in VFS's refusal to approve the two-year Stellar lease, which resulted in defendants' default under both contracts. GE Capital's motion to dismiss defendants' third-party claims for tortious interference with the Falcon and Sky King Loans is DENIED.

#### b.   Stellar Lease

Defendants further claim that GE Capital tortiously interfered with the two-year Stellar lease. GE Capital argues that although Falcon Fifty and Stellar both signed the contract, it was not legally valid until VFS gave consent to the lease. Defendants respond that in the absence of a valid contract, the signed lease created an actionable business expectancy.

21

Under Virginia law defendants are required to plead that the interferor used "improper means" to interfere with a business expectancy. The Virginia Supreme Court has held that "[w]hile improper methods or means need not be 'inherently illegal or tortious[,]' . . . breach of [contract] is not in itself an improper method or means."[60]

> Improper methods or means generally involve violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition.[61]

Defendants have not alleged that GE Capital committed any of these acts in connection with its breach of the Falcon Security Agreement. Therefore, GE Capital's motion to dismiss defendants' third-party claim for tortious interference with the two-year Stellar lease is GRANTED with leave to amend.

### C.    NYRISA Claims Against GE Capital, VFS, GEECAT, and Canal

Defendants allege that the Falcon and Sky King Loans "do not comply with the requirements of NYRISA" and should be declared "invalid, void and unenforceable," or in the alternative, defendants' liability for the sale should be

---

[60]    *Preferred Sys. Solutions, Inc. v. GP Consulting*, LLC, 284 Va. 382, 403-04 (2012).

[61]    *Id.* at 404.

"limited to the purchase price of the aircraft[s], less amounts already paid."[62] But

defendants do not specify which subsections of which agreements fail to comply

with which provisions of NYRISA. More importantly, NYRISA does not govern

these contracts because, as stated in the Security Agreements, both aircrafts were

purchased "predominantly for business purposes."[63] "By its terms, [NYRISA]

does not apply to goods sold for a business or commercial use."[64]

Defendants argue that NYRISA should nevertheless apply because the

Rogers made some personal trips on the planes. That may be true. But the

language of the statute is clear – goods are defined as "all chattel personal . . . sold

for *other than a commercial or business purpose.*"[65] Whether the Rogers made

personal use of the aircrafts is irrelevant because the planes were purchased *for a*

*business purpose.* The NYRISA claims are dismissed without leave to amend.

## VI.   CONCLUSION

---

[62]     Counterclaims ¶¶ 58-62.

[63]     Falcon Security Agreement § 5(a); Sky King Security Agreement §
5(a).

[64]     *Ruminant Nitrogen Prods. v. Zittel*, 78 A.D.2d 766, 766 (4th Dep't
1980).

[65]     NY Pers. Prop. L. § 401(1) (emphasis added).

For the foregoing reasons, plaintiffs' and third-party defendants' motion to dismiss defendants' counterclaims and third-party claims is GRANTED in part and DENIED in part.  Defendants may proceed on the breach of contract counterclaim against VFS, the breach of the implied covenant of good faith and fair dealing counterclaim against GEECAT, and the tortious interference with contract claim against GE Capital as to the Falcon and Sky King Loans. Defendants' tortious interference with contract claim against GE Capital as to the Stellar lease is dismissed with leave to amend.  Defendants' breach of contract claims against GE Capital and NYRISA claims are dismissed with prejudice.  The Clerk of the Court is directed to close this motion (Dkt. No. 33).  The final pre-trial conference will proceed as scheduled on May 13, 2014 at 4:30 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 30, 2014

## - Appearances -

**For Plaintiffs and Third-Party Defendants:**

Christopher A. Lynch, Esq.
Reed Smith
599 Lexington Avenue
New York, NY 10022
(212) 521-5400

**For Defendants:**

Kenneth Michael Murray, Esq.
Beugelmans, PLLC
80 Broad Street, Ste. 1302
New York, NY 10004
(646) 350-0050

Neil R. Lapinski, Esq.
Philip A. Giordano, Esq.
1925 Lovering Avenue
Wilmington, DE 19806
(302) 652-2900